# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 00662 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Eric Ollison brought this Section 1983 lawsuit[1] against a slew of correctional and medical personnel[2] at two Illinois Department of Corrections (IDOC) prisons. R. 1, Compl.[3] He claims that, while incarcerated, the Defendants ignored his chronic kidney disease, causing him to suffer acute renal failure in January 2014. *Id.* Several of the Defendants filed motions to dismiss part of the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. R. 38, Hardy's Mot. to Dismiss; R. 62, Stateville Wexford Defs.' Mot. to Dismiss; R. 69, Nicholson's

---

[1]This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

[2]Ollison filed this complaint against the following individuals at Stateville Northern Reception and Classification Center: Warden Marcus Hardy; Dr. Arthur Funk; Dr. Sylvia Mahone, Mary Diane Schwarz; Dr. Steven Taller (deceased); Sarah L. Mays; and Donna Morris (collectively, the "Stateville Defendants"). Ollison also brought claims against the following individuals at Illinois River Correctional Center: Warden Walter Nicholson (2012); Warden Greg Gossett; Dr. Carla B. Greby; Dr. Rebecca S. Einwohner; Lisa Bishop; Connie Sword; Edna L. Greenhagen; Shirley Law; Christine Peltier; C. Darcy Reynolds; Kandis Critz; David Hopkins; Karena Barker; M. Francie Maurice; Jennifer Easley; Corey Wise; and Robbie Johnson (collectively, the "Illinois River Defendants"). Wexford Health Sources, Inc., which contracts with IDOC to provide medical care at IDOC prisons and employs the individual medical personnel defendants, is also a party to this suit.

[3]Citations to the record are "R." followed by the docket entry number and, where applicable, a page or paragraph number.

Mot. to Dismiss; R. 48, IDOC Ill. River Defs.' Mot. to Dismiss, Sever and Transfer; R. 93, Gossett's Suppl. Mot. to Dismiss. The Illinois River Defendants also moved to transfer the entire case to the Central District of Illinois (where Illinois River is located), or alternatively to sever the claims against the Illinois River Defendants and transfer those to the Central District, R. 61, Wexford Defs.' Mot. to Transfer; R. 78, Einwohner, Sword, and Maurice's Suppl. Mot. to Transfer; R. 87, Reynolds's Suppl. Mot. to Transfer. For the reasons discussed below, the Court grants the motions to dismiss (rendering the motions to sever moot), leaving only the claims against certain Illinois River Defendants intact. The Court also grants the motions to transfer this lawsuit to the Central District of Illinois.

## I. Background

For the purposes of this Opinion, the facts alleged in the Complaint are accepted as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At all times relevant to the Complaint, Ollison was a prisoner in IDOC custody. Compl. ¶ 6. Ollison's claims arise out of his treatment—or rather, the lack thereof—at two of the facilities where he was incarcerated, Stateville Northern Reception and Classification Center (located in the Northern District of Illinois) and Illinois River Correctional Center (located in the Central District of Illinois). *Id.* Ollison was imprisoned at Stateville for a short period from December 2011 to January 2012, when he was transferred to Illinois River. *Id.* ¶¶ 50, 55.

Ollison had already been diagnosed with Stage III chronic kidney disease when he arrived at Stateville. Compl. ¶ 48. He also suffered from proteinuria, nephrotic syndrome, hyperlipidemia, and hypertension. *Id.* Before Stateville, Ollison had been detained at the Kankakee County Detention Center, where he received adequate medical treatment, including frequent laboratory work-ups. *Id.* ¶¶ 47, 49. Ollison took medication to regulate his various conditions—including the kidney disease—and had regular appointments with a nephrologist to monitor his status. *Id.* ¶ 49.

Ollison's medical care deteriorated upon his arrival at Stateville. At intake, he was interviewed by Defendant Sarah Mays, a registered nurse, about his medical history, and given a physical examination by Dr. Steven Taller and Mary Schwarz, a physician's assistant. Compl. ¶ 50. Although Ollison told Mays, Taller, and Schwarz about his chronic kidney disease and other medical conditions, none of them noted that information in Ollison's medical chart. *Id.* ¶ 51. Nor did Stateville's medical personnel independently discover Ollison's kidney disease, even though laboratory tests performed by Dr. Taller yielded abnormal results suggestive of the disease. *Id.* ¶ 53. For these reasons, and because no one obtained Ollison's medical records from Kankakee, the kidney disease was omitted from Ollison's charts and he did not receive the care that he needed. *Id.* ¶ 54.

On January 16, 2012, Ollison was transferred to Illinois River. Compl. ¶ 55. His transfer screening report—completed at Stateville—did not note that Ollison had a kidney disease. *Id.* When Ollison underwent an intake reception screening at

3

Illinois River, the medical personnel there recorded that he had "no significant history"—despite Ollison informing them of his kidney problem—and that his "problem list was updated," yet the list did not note the kidney disease or any of Ollison's other conditions. *Id.* ¶¶ 62-63. Ollison's kidney disease remained unrecorded by Illinois River personnel over the next several months, despite several abnormal laboratory results that should have revealed it. *Id.* ¶¶ 66-69. After July 2012, no laboratory tests were performed on Ollison until March 2013—at which time they came back with seriously abnormal readings, including a high level of urine protein. *Id.* ¶¶ 70-71. It was only at this point that Ollison's prison doctor referred him to a nephrologist. *Id.* ¶¶ 72-73.

The nephrologist saw Ollison in March and April 2013, and ordered various tests. Compl. ¶¶ 74-79. But neither the nephrologist nor Ollison's primary care physician developed a comprehensive treatment plan to control the disease. *Id.* ¶¶ 79-80. What's more, Ollison's appointments with the nephrologist were discontinued after April 2013. *Id.* ¶ 81. In July 2013, Illinois River received Ollison's medical records from Kankakee County Detention Center; the records traced the history of Ollison's kidney disease. *Id.* ¶ 84. But even after receiving these records, the Illinois River medical staff still did not take affirmative actions to monitor or manage his condition. *Id.* ¶ 85.

In November 2013, Ollison began to feel unwell. He complained of sluggishness, dry mouth, chills, shortness of breath, and a salty taste in his mouth that refused to go away. Compl. ¶ 87. He began vomiting regularly for weeks on

end, and his face and legs started to swell. *Id.* He went days without urinating. *Id.* Although he informed the medical staff many times about these symptoms—which were classic signs of renal failure—Ollison received no treatment for his kidneys. *Id.* ¶¶ 86, 88-89. Indeed, the medical staff failed to order so much as a laboratory test, much less refer Ollison to a nephrologist. *Id.* ¶¶ 90-91. All they did was take Ollison's blood pressure and treat him for acid indigestion and heartburn. *Id.* ¶ 93.

Ollison filed three grievances complaining of his lack of treatment, two in December 2013 and one in January 2014. Compl. ¶ 94. In the grievances, Ollison "begg[ed] … to have [himself] fully checked out," stressing that "there is no way [his] body should be reacting this way." *Id.* ¶ 95. But his complaints were dismissed as "moot" and not an emergency, or ignored entirely. *Id.* ¶¶ 96, 98, 100-01.

On December 30, 2013, after repeatedly vomiting throughout the day, Ollison collapsed on the floor of his cell and began writhing in pain and shivering and shaking uncontrollably. Compl. ¶¶ 105-07. His cellmate hit the emergency button, calling a corrections officer over. *Id.* ¶ 106. The corrections officer sent for a nurse, but when she arrived she merely gave Ollison Ibuprofen and Maalox. *Id.* ¶ 108. Over the next two weeks, Ollison saw a number of physician's assistants, nurses, and doctors at Illinois River, but all of them dismissed his complaints, and no laboratory tests were performed until January 16, 2014. *Id.* ¶¶ 109-114. Those tests were reported to the nephrologist, who recommended that Ollison be sent to the hospital immediately. *Id.* ¶ 116.

Ollison was admitted to the emergency room at Graham Hospital and diagnosed with acute renal failure. Compl. ¶ 117. Due to the severity of Ollison's condition, he was transferred from Graham to the larger St. Francis Medical Center in Peoria, Illinois. *Id.* ¶ 119. There, Ollison began hemodialysis. *Id.* ¶ 120. But by that point, his condition was so serious that it soon led to complications. He developed paralysis on his left side, and began having seizures. *Id.* ¶ 121. He suffered acute respiratory failure. *Id.* Eventually, he went into a coma. *Id.* ¶ 126.

Because Ollison was a prisoner and ward of the state, the power to make medical decisions on his behalf was vested in Greg Gossett, the Warden at Illinois River. Compl. ¶ 124. Gossett did not inform Ollison's family of his hospitalization, and they only learned of it after a family member called the prison to ask about Ollison's whereabouts. *Id.* ¶ 125. After Ollison's family discovered what had happened to him, they also learned that a do-not-resuscitate order had been instituted for Ollison—against their wishes—and were advised that "the plug should be pulled." *Id.* ¶ 127.

In February, however, Ollison began to recover and was finally discharged from the hospital in April 2014. Compl. ¶¶ 128-29. Although his condition has improved, Ollison has not made a full recovery and will likely suffer permanent injury, including the loss of full functionality in his limbs and the loss of some mental functions. *Id.* ¶ 130. On January 15, 2016—nearly two years after he was admitted to Graham Hospital with acute renal failure—Ollison filed suit against the Defendants under Section 1983, claiming that their deliberate indifference to

6

his kidney disease caused him injury and violated his Eighth Amendment right to be free from cruel and unusual punishment.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly,* 550 U.S. 544, 555 (2007). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)).

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

With regard to the statute of limitations, an argument that a complaint was filed too late is actually an affirmative defense. So, instead of applying Rule 12(b)(6), the proper way to analyze a dismissal motion on that ground is as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Like Rule 12(b)(6) motions, however, the allegations must be taken as true, and the Court must be sensitive to the potential need for discovery. Although a plaintiff is not required to plead facts in the complaint to anticipate and defeat a statute of limitations defense, when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, dismissal is appropriate. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010) ("[I]f it is plain from the complaint that the [statute of limitations] defense is indeed a bar to the suit dismissal is proper without further pleading.") (citations omitted).

### III. Analysis

The many Defendants in this case have filed an array of motions to dismiss, sever, or transfer some or all of Ollison's claims. The motions boil down to five issues: (1) whether Ollison's claims against the Stateville Defendants and Nicholson, for alleged misconduct in 2011 and 2012, are barred by the statute of limitations; (2) whether the Complaint adequately alleges the personal involvement of Hardy, Nicholson, and Funk, who had supervisory roles; (3) whether the claims

against the Illinois River Defendants should be severed from the claims against the Stateville Defendants for improper joinder; (4) whether all or part of Ollison's claims should be transferred to the Central District of Illinois; and (5) whether Count Four of the Complaint, which Ollison characterizes as a "Supplemental State Claim for Indemnification by State of Illinois," is barred by sovereign immunity. Each of these issues is addressed in turn.

### A. Statute of Limitations

The Stateville Defendants and Nicholson, the Warden of Illinois River in 2012, argue that Ollison's claims against them are time-barred and therefore must be dismissed. *See* R. 39, Hardy's Br. at 3-5; Stateville Wexford Defs.' Mot to Dismiss ¶¶ 12-18; R. 70, Nicholson's Br. at 3-5. State law supplies the statute of limitations for Section 1983 claims. *Heard v. Sheahan*, 253 F.3d 316, 317 (7th Cir. 2001). Federal courts apply the statute of limitation for the tort most closely analogous to the Section 1983 claim asserted, which, for deliberate-indifference claims premised on lack of medical treatment, is medical malpractice. *Devbrow v. Kalu*, 704 F.3d 765, 768 (7th Cir. 2013). In Illinois, medical malpractice claims must be brought within two years of accrual. *Ray v. Maher*, 662 F.3d 770, 773 (7th Cir. 2011) (citing 725 ILCS 5/13-202). So Ollison's claims against the Stateville Defendants and Nicholson may only proceed if they accrued on or after January 15, 2014.

But when did the claim accrue? Ordinarily, a claim accrues when all the elements of the claim have occurred so that the plaintiff can file suit and obtain

relief. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182 (2014). When a claim is premised on continual *inaction*, however, the limitations clock does not start until the inaction ends or when the inaction is no longer a proper basis for the claim. More specifically, for a deliberate-indifference claim based on denial of medical care, the Seventh Circuit has held that the limitations clock starts to tick either when the defendant no longer refuses to treat the inmate's condition or when the defendant no longer has the power to do anything about the condition (say, if the inmate leaves the prison). *Heard*, 253 F.3d at 318. The Stateville Defendants contend that Ollison's claim against them therefore accrued when he was transferred to Illinois River on January 16, 2012, because the Stateville Defendants no longer could provide medical care to Ollison. Stateville Wexford Defs.' Mot. to Dismiss ¶ 12; Hardy's Br. at 3. Nicholson argues that the claims against *him* accrued when he stopped working at Illinois River sometime in 2012 (neither party provides an exact date of Nicholson's departure, but that is not important because Ollison did not file the Complaint until January 2016). Nicholson's Br. at 3, 5. That is, the clock began running on each respective defendant when he or she no longer "had the power to do something about [Ollison's] condition." *See Heard*, 253 F.3d at 318. So any alleged wrongs from 2011 or 2012 cannot be raised in a complaint filed in 2016.

But Ollison maintains that the Complaint is timely because his claim only accrued when he knew "his injury and its cause," *Devbrow*, 705 F.3d at 768, and that occurred on January 16, 2014, when he was admitted to Graham Hospital for acute renal failure. R. 88, Pl.'s Resp. Br. at 7. Although he had experienced ill-

10

symptoms before that date, Ollison argues that he had no way of knowing that those symptoms were caused by the lack of treatment for his kidney disease. *Id.* And because he was unaware of that causality, Ollison did not know that he was not receiving adequate medical treatment or that any of the Defendants were deliberately indifferent to a serious medical need until he was hospitalized. *Id.*

But Ollison's own Complaint contradicts his argument. In it, Ollison states that he told medical personnel about his kidney disease when he first arrived at Stateville, so he himself recognized that the condition needed medical care. *See* Compl. ¶ 51. He again reported the kidney disease during his intake screening at Illinois River. *Id.* ¶ 63. So Ollison should have known that he was not getting adequate medical attention when he received, as he himself alleges, no monitoring or treatment for his kidney condition—especially given the contrast between the indifference of the staff at Stateville and Illinois River and the regular, proactive care Ollison received at the Kankakee County Detention Center. In the Complaint, Ollison acknowledges that he had been diagnosed with kidney disease while at Kankakee and received "consistent and competent medical care[] from a primary care physician and from a nephrologist" there. *Id.* ¶¶ 47-48. This care included "frequent laboratory work-ups," monthly or bi-monthly meetings with a nephrologist, and medications to manage the disease. *Id.* ¶ 49.

So Ollison knew he had a serious medical condition when he arrived at Stateville. Compl. at 9. And he knew, from his time at Kankakee, that the condition required medical treatment. Thus, when Ollison received far inferior treatment—

11

indeed, *no* treatment—at Stateville and Illinois River, he knew all the facts that comprised a claim for deliberate indifference. *See Devbrow*, 705 F.3d at 769 ("[A] prisoner may obtain nominal damages for an Eighth Amendment deliberate-indifference violation in the absence of a compensable physical injury; actual damages are not an element of the claim." (citing *Cotts v. Osafo*, 692 F.3d 564, 569 (7th Cir. 2012))).

It is worth noting an argument that Ollison could have presented (but did not). Specifically, Ollison could have tried arguing that because "accrual rules are applied to the substance of the claim before the court, and *this* deliberate-indifference claim seeks to redress for a concrete physical injury [that is, acute renal failure], not probabilistic future harm or an abstract injury for which nominal damages are available as a remedy," the claim accrued on the date when he learned of the acute renal failure on January 16, 2014. *Devbrow*, 705 F.3d at 769. This argument would have been best supported by *Devbrow*. In that case, the inmate entered prison knowing that he was at an elevated risk for prostate cancer, and required a screening biopsy within two to four years. 705 F.3d at 766. Although he told the prison doctors about this need, he did not receive a biopsy until seven years later. *Id.* The biopsy led to a diagnosis of prostate cancer, and a follow-up bone scan showed that the cancer had metastasized and was no longer operable. *Id.* The inmate sued for deliberate indifference two years after he was diagnosed with cancer, *id.* at 767, and the Seventh Circuit held that the claim accrued, at the earliest, when the plaintiff received the cancer diagnosis (and possibly not until he

12

learned it had metastasized)—*not* when the prison doctors finally referred him for a biopsy and "the deliberate indifference ceased," *id.* at 769. The Seventh Circuit reasoned that, although the plaintiff *could* have brought a deliberate-indifference claim when he was referred for the biopsy—and before he had a compensable physical injury in the form of the cancer diagnosis—that was not the claim he had brought. *Id.* Because the plaintiff was seeking actual damages for cancer, rather than nominal damages for the violation alone, and he did not know about the cancer until it was diagnosed, the date of the diagnosis was the appropriate accrual date. *Id.*

But *Devbrow* is distinguishable from the case at hand. At all times before his diagnosis, the inmate in *Devbrow* was incarcerated at the same facility. So the defendants retained the "power to do something about his condition," *see Heard*, 253 F.3d at 318—and, by extension, remained exposed to liability for failure to exercise that power—all the way up to the accrual date. Indeed, *Devbrow* acknowledged that a continuing deliberate-indifference constitutional violation terminates once a prisoner leaves the jail. *Devbrow*, 705 F.3d at 770 (discussing *Heard*, 253 F.3d at 320). This is consistent with other Seventh Circuit authority. *See Heard*, 253 F.3d at 318; *Blakenship v. Obaisi*, 443 F. App'x 205, 208 (7th Cir. 2011) (unpublished order) (dismissing claims against a prison doctor whose treatment of the plaintiff ceased more than two years before the claim was filed when the plaintiff was transferred to a different facility).

13

Hence, although continuing refusals to treat a prisoner's disease may delay the start of the limitations clock, the clock *does* start when the defendants in question no longer have any control over the prisoner's medical care. *See Heard*, 253 F.3d at 318. For the Stateville Defendants, this was when Ollison left the facility in January 2012, and for Nicholson, this was when he left Illinois River sometime in 2012. As explained above, based on Ollison's own allegations in the Complaint, Ollison had all that he needed to bring the claim in 2012 against the Stateville Defendants and Nicholson, and they no longer had the responsibility to treat him after his transfer to Illinois River (and, for Nicholson, after he left the warden job at that prison). Because Ollison did not file the Complaint until January 2016, around four years afterwards, his claims against the Stateville Defendants and Nicholson are dismissed as untimely.

## B. Personal Involvement of Funk, Hardy, and Nicholson

For the sake of completeness, the Court will discuss the argument, pressed by the supervisory defendants, that the Complaint fails to adequately allege their personal involvement. Specifically, Nicholson and two of the Stateville Defendants, Funk and Hardy, were supervisory personnel who did not have any direct contact with Ollison. Compl. ¶¶ 15-18, 20-22, 27, 29-32. They argue that, because they were not directly responsible for any of the acts or omissions giving rise to Ollison's claim, they cannot be found liable for deliberate indifference. *See* Hardy's Br. at 5-8; Stateville Wexford Defs.' Mot. to Dismiss ¶¶ 19-22; Nicholson's Br. at 6-9.

14

Because there is no *respondeat superior* liability under Section 1983, a plaintiff must demonstrate (and at the dismissal-motion stage, allege) that each defendant was personally involved with the alleged constitutional violation. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). But a supervisor may be liable for the violations of his or her subordinates if the supervisor approved of, or knew of but turned a blind eye to, the subordinates' misconduct. *Id.* Additionally, a senior official may be personally liable for harms resulting from systemic constitutional violations, even if the official is unaware of a specific plaintiff's situation. *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996)

The Complaint does not allege facts that impute either form of personal liability against the three Defendants. As wardens, Hardy and Nicholson were not directly responsible for Ollison's care, and Ollison does not claim that either was personally aware of Ollison's medical condition. Ollison argues that they are nevertheless liable because they were "aware of the practices that cause[d] Ollison injury" and "facilitated and/or turned a blind eye to those practices." Pl.'s Resp. Br. at 11. Furthermore, Ollison alleges that Hardy and Nicholson "purposefully ignor[ed] their subordinates' misconduct." *Id.* But these are "mere conclusory statements" that simply recite the elements of supervisory liability, and thus are insufficient to support a plausible claim. *See Iqbal*, 556 U.S. at 663. It would be one thing if Ollison had alleged (as some prisoners do) that he wrote letters to the Wardens, informing them of the lack of medical treatment, or that he had spoken with the Wardens about the problem. But Ollison has provided no factual

15

allegations that suggest Hardy and Nicholson knew specifically of Ollison's kidney disease and inability to receive treatment. Nor does he allege other instances of deliberate indifference at either facility that would support the inference that Stateville or Illinois Rivers personnel were *systemically* withholding medical care from prisoners.

Ollison's claim against Funk fails for similar reasons. Funk was the Medical Director at Stateville, in charge of promulgating the rules and procedures governing medical care at the facility. Compl. ¶¶ 21-22. Ollison argues that Funk was "directly responsible" for patient care, because he "had the obligation to ensure that the intake information and records were complete and accurate" but did not do so in Ollison's case. Pl.'s Resp. Br. at 9. But Funk did not conduct Ollison's intake screening—in fact, he was not even present at the intake. *See* Compl. ¶¶ 50-51. And Ollison does not allege that Funk had reason to believe that the personnel who *did* conduct the intake committed any misconduct, or that there were systemic problems with the accuracy of patient records that led to constitutional violations. So, with no plausible allegations of personal liability, the claims against Funk, Hardy and Nicholson would have failed even if the claims had been timely filed.

### C. Motion to Sever Illinois River Claims

Next, the Court turns to the motions to sever the claims against the Illinois River Defendants from those against the Stateville Defendants. Because all claims against the Stateville Defendants are dismissed as untimely, *see* Section III.A, only

16

the Illinois River claims remain, making it unnecessary to rule on the motions to sever. Again, however, for the sake of completeness, had the Stateville claims survived, the Court would have kept the two sets of claims in one complaint and the motions to sever would have been denied.

Federal Rule of Civil Procedure 20 permits joinder of defendants when a right to relief against them arises out of the "same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). In prisoner-rights cases, "severance is not mandatory simply because a complaint names officials from more than one prison as defendants." *Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1018 (N.D. Ill. 2015). Although Ollison was transferred from Stateville to Illinois River, his injury—the failure to provide medical care for his kidney disease—was "discre[te] and continuous." *See Young v. Obaisi*, 2015 WL 8013437, at *5 (N.D. Ill. Dec. 7, 2015). This injury forms a "common thread tying together [Ollison's] allegations against several distinct groups of defendants" at two correctional facilities. *See Ruiz*, 144 F. Supp. 3d at 1018 (quotation marks and citation omitted). And no doubt the claims against both the Stateville Defendants and Illinois River Defendants would share common questions of fact concerning Ollison's medical history and the need for medical treatment. Thus, had the Stateville claims been filed within the

17

proper time period, the Stateville and Illinois River claims would have been properly joined.[4]

## D. Motion to Transfer

The Defendants argue that any surviving claims should be transferred to the Central District of Illinois, where Illinois River is located. A district court may transfer any civil action filed in a proper venue to "any other district or division where it might have been brought."[5] 28 U.S.C. § 1404(a). In deciding whether to do so, the court must consider the convenience of the parties and witnesses, and the interest of justice. With the Stateville Defendants' claims dismissed, transfer to the Central District is the better course.

On convenience, the Court must consider the "availability of and access to witnesses, [] each party's access to and distance from the resources in each forum[,] … the location of material events[,] and the relative ease of access to sources of proof." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted). Here, most of these factors point to

---

[4]Alternatively—if formalistically—Ollison's claims would have been properly joined because (1) he is suing Wexford for its employees' alleged misconduct at both Stateville and Illinois River; (2) Federal Rule of Civil Procedure 18(a) "allows all of plaintiff's claims against Wexford to be brought in one case, regardless of whether Wexford's alleged constitutional deprivations at the [two] correctional centers each constituted its own[] separate transaction or occurrence"; and (3) Ollison's claims against the individual Stateville Defendants arise out of the same transaction or occurrence as his Stateville-related claims against Wexford (likewise his Illinois River-related claims against Wexford and the Illinois River Defendants), permitting joinder of those under Federal Rule of Civil Procedure 20(a). *See Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1017 (N.D. Ill. 2015).

[5]Ollison does not dispute that this action could have been brought in the Central District of Illinois. R. 76, Pl.'s Second Resp. Br. at 6.

18

the Central District. The remaining individual defendants all work at Illinois River. The remaining claims all arise out of conduct at Illinois River. The primary non-party witnesses—the medical personnel who treated Ollison for his acute renal failure—work at hospitals located in the Central District. That is a crucial point, because the convenience of non-parties deserves special emphasis beyond the litigants themselves. Ollison's medical records are probably located in the Central District; at the very least, the hospital records where Ollison was treated following his renal failure will be in that District (to be sure, because records can be easily transmitted, this point is not nearly as important as the convenience of non-party *witnesses*).

Ollison argues that transferring the case would greatly inconvenience him, because he requires dialysis and regular medical treatment in Chicago. R. 76, Pl.'s Second Resp. Br. at 7. This is an important point, but there are a dozen or so Illinois River Defendants to weigh on the other side. Also, Ollison has not described the dialysis or medical treatment with any specificity, such as the regularity and frequency of the treatments, how long they take, or whether there is something unique about the specific facility in the Northern District. Overall, the convenience factor supports transfer.

As for the "interest of justice" element, this factor relates to the "efficient administration of the court system," and requires courts to look at "docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective

19

desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Research Automation*, 626 F.3d at 978 (internal citations omitted). Neither side presents compelling arguments weighing in either direction. Because both venue options are located in Illinois, there is little reason for either district to have more familiarity with the relevant law. The Defendants argue that judges in the Central District may have more knowledge of the policies and procedures of Illinois River, R. 49, IDOC Ill. River Defs.' Br. at 9; Wexford Defs.' Mot. to Transfer at 10, but those policies and procedures are unlikely to be so complex as to weigh heavily in favor of transfer. And neither side presents data suggesting that either venue would provide a speedier trial. So the interest of justice element is neutral.

The overriding factor in the transfer analysis, then, is the convenience of the parties and non-parties. For the reasons discussed, the convenience factor weighs heavily in favor of the Central District, so the motions to transfer are granted.

### E. Indemnification Claim Against the State of Illinois

Finally, the Court addresses the motion to dismiss Count Four of the Complaint, which Ollison captions the "Supplemental State Claim for Indemnification by State of Illinois." Compl. at 29. In it, Ollison asserts that, "[s]hould any employee and/or agent of the State of Illinois be found liable to plaintiff … then the State of Illinois must indemnify such judgment for" damages and attorneys' costs and fees. *Id.* ¶ 166.

It is unclear if by this allegation Ollison means to join the State of Illinois as a party to this action. Although the Complaint's caption does not include Illinois, the text of the Complaint names the State of Illinois as an "indemnification party." Compl. ¶ 44. But it is long-settled that the Eleventh Amendment bars federal courts from exercising jurisdiction over "actions against a state brought by her own citizens," unless the state consents to suit. *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992) (citations omitted). The fact that a state chooses to indemnify its employees for damages does not constitute consent. *Mann v. Vogel*, 2010 WL 5395631, at *2 (C.D. Ill. Dec. 23, 2010) (citations omitted). So, to the extent that Ollison brings a claim directly against the State of Illinois, that claim is dismissed.

But Ollison contends that Count Four should not be dismissed because it "is not brought to relieve the individual defendants of any liability or force the state of Illinois to take any particular action," but merely to provide a "relevant background" to Ollison's claims against Defendants Wise and Johnson (both IDOC

21

employees) in their individual capacities.[6] Pl.'s Second Resp. Br. at 14. It is unclear exactly what Ollison means by this. But assuming that Ollison intends Count Four to designate the State of Illinois as indemnitors to Wise and Johnson, the count still must be dismissed, since it is a "mere legal conclusion" that "does not … purport to make a substantive claim," *see Wright v. Carter,* 2015 WL 4978688, at *6 (N.D. Ill. Aug. 20, 2015), and, in any event, a federal court cannot enter a money judgment requiring the State of Illinois to indemnify its employees. The motion to dismiss Count Four is granted.

## IV. Conclusion

For the reasons discussed, the motions to dismiss the claims against the Stateville Defendants, R. 38, R. 62, and against Nicholson, R. 69, and the motion to dismiss Count Four, R. 48, are granted. The motions to sever the claims against the Stateville Defendants and Illinois River Defendants, R. 48, R. 61, are denied as moot in light of the dismissal of the Stateville Defendants. The motions to transfer

---

[6]There is some uncertainty as to whether Ollison intends to sue Wise and Johnson in their individual or official capacities. The Complaint states that "[t]hey are being sued in their individual/personal capacity." Compl. ¶ 43. But Ollison's Second Response Brief argues that Count Four should not be dismissed because "the Eleventh Amendment does not bar claims against employees of the state sued in their official capacities." Pl.'s Second Resp. Br. at 14. Because the latter statement is clearly wrong (except in suits for injunctive relief, which this is not), *see Scott v. O'Grady,* 975 F.2d at 369, and because Ollison's argument makes no sense otherwise, the Court will assume that Ollison made a typographical error in his Second Response Brief and meant to say that the Eleventh Amendment does not bar claims against state employees in their *individual* capacities.

the remaining claims to the Central District of Illinois, R. 48, R. 61, are granted.

The status hearing of December 7, 2016 is vacated.

ENTERED:

<u>      s/Edmond E. Chang      </u>
Honorable Edmond E. Chang
United States District Judge

DATE: November 29, 2016