E-FILED
Friday, 10 December, 2021  06:42:46 PM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-CV-1077 |
| vs. | ) | |
| | ) | JURY DEMAND |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

NOW COME Defendants, Gregory Gossett, Robbie Johnson, and Corey Wise, by and through their attorney, Kwame Raoul, Attorney General for the State of Illinois, and state the following for their Answer and Affirmative Defenses to Plaintiff's Complaint, [Doc. 1]:

## NATURE OF CLAIM

1.     This action arises under the United States Constitution and the laws of the United States, specifically the Civil Rights Act of 1871 (42 U.S.C. § 1983), to redress deprivations of the civil rights of plaintiff through acts and/or omissions of defendants committed under color of law. Specifically here, defendants deprived plaintiff of his rights under the Eighth and Fourteenth Amendments to the United States Constitution, by the deliberate indifference of employees or agents of the Illinois Department of Corrections and their contractor, WEXFORD HEALTH SOURCES, INC., to plaintiff's serious medical needs, proximately causing plaintiff serious and permanent injuries and substantial pain and suffering.

**ANSWER:  Defendants admit that the Plaintiff has filed a complaint based on a purported claim under 42 U.S.C. § 1983 and the Eighth and Fourteenth**

Amendments to the United States Constitution. Defendants deny the remaining allegations in paragraph 1.

2.    Additionally, plaintiff relies upon the Court's supplemental jurisdiction to assert the Illinois state claim of indemnification.

**ANSWER:  Defendants admit that the Court has the power to exercise supplemental jurisdiction over a state law claim.**

JURISDICTION AND VENUE

3.    Jurisdiction is based upon 28 U.S.C. §§ 1343, 1331, and 1367.

**ANSWER:  Defendants admit that the United States District Court for the Central District of Illinois has jurisdiction over this action.**

4.    Venue is founded in this judicial district upon 28 U.S.C. § 1391 as acts complained of occurred in this district.

**ANSWER:  Defendants admit that venue is proper in the United States District Court for the Central District of Illinois.**

PARTIES

5.    Plaintiff, ERIC OLLISON, was and now is a citizen of the United States, and resides within the jurisdiction of this Court.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5.**

6.    The events recounted here occurred while plaintiff was a sentenced prisoner in the custody of Illinois Department of Corrections (IDOC), at Stateville Northern Reception and Classification Center (Stateville NRC) in Joliet, Illinois, and at Illinois River Correctional Center (Illinois River) in Canton, Illinois. Plaintiff is no longer in the custody of the IDOC.

**ANSWER: Defendants admit the allegation in paragraph 6.**

7.      At all times mentioned herein, WEXFORD HEALTH SOURCES, INC. (WEXFORD) was and is a Florida corporation, doing business in Illinois.

**ANSWER: Defendants admit the allegations in paragraph 7.**

8.      At all times mentioned herein, WEXFORD was and is under contract with the Illinois Department of Corrections to furnish medical care to inmates incarcerated at IDOC correctional facilities, including Stateville NRC and Illinois River.

**ANSWER: Defendants deny that paragraph 8 fully and accurately describes the contractual agreement between the Illinois Department of Corrections and Wexford Heath Sources, Inc..**

9.      Under this contract, WEXFORD has been at all times relevant to this case, the sole provider of health care services at Stateville NRC and Illinois River.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.**

10.      As the sole provider of health care services at all times relevant to this case, WEXFORD has employed and supervised all medical and health care staff at Stateville NRC and Illinois River who provide medical care to inmates, including plaintiff.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10.**

11.      In its capacity as contractor to the IDOC, WEXFORD has promulgated rules, regulations, policies and procedures for medical intake, evaluation, diagnosis, treatment, and overall medical care of inmates at the facilities in which it provides health care services.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11.**

3

12.     The policies and procedures of WEXFORD are and have been implemented by and through its employees.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12.**

13.     WEXFORD and its employees were, in all acts and omissions alleged herein, acting under color of law.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13.**

### Parties from Stateville Reception and Classification Center

14.     Stateville Reception and Classification Center is one of the major adult male intake and processing units for the IDOC. The Stateville NRC is a temporary housing facility where inmates are held until it is determined to which IDOC facility they will be assigned. This process often lasts weeks or months.

**ANSWER: Defendants make no answer to the allegations in paragraph 14 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

15.     At all times relevant to the events at issue in this case, MARCUS HARDY was employed by the IDOC as the Warden, or Chief Administrative Officer, of Stateville NCR.

**ANSWER: Defendants make no answer to the allegations in paragraph 15 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

16.     As Chief Administrative Officer, Warden HARDY was responsible for the overall operation, policies, and management of Stateville NRC. Included in his responsibilities was the hiring and training of all personnel employed by IDOC at Stateville NRC and the formulating of rules, regulations, and policies governing its employees and inmates.

**ANSWER: Defendants make no answer to the allegations in paragraph 16 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

17.    As Chief Administrative Officer, Warden HARDY also promulgated rules, regulations, policies, and procedures at Stateville NRC for the provision of certain medical care. This included the medical screening of and the administration of medical services to inmates at Stateville NRC by medical care providers employed by the IDOC, as well as by medical care providers employed by WEXFORD.

**ANSWER: Defendants make no answer to the allegations in paragraph 17 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

18.    As a prisoner and ward of the state, Mr. OLLISON's guardian was the Warden of Stateville NRC, who was in charge of his medical care and medical decisions while he was incarcerated there.

**ANSWER: Defendants make no answer to the allegations in paragraph 18 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

19.    Warden HARDY was at all times relevant to the events at issue in this case acting under color of law.

**ANSWER: Defendants make no answer to the allegations in paragraph 19 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

20.    Doctor ARTHUR FUNK or Doctor JOHN DOE was a physician employed by WEXFORD as the Medical Director of Stateville NRC.

**ANSWER: Defendants make no answer to the allegations in paragraph 20 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

21.    As Medical Director of Stateville NRC, Doctor FUNK or Doctor JOHN DOE was the final policymaker for WEXFORD and had final authority to and did promulgate rules,

regulations, policies, and procedures for the provision of medical care to inmates, including

medical screening and care of inmates and administration of medication to the inmates by

medical care providers such as nurses, doctors, and certified medical technicians employed at

Stateville NRC.

**ANSWER: Defendants make no answer to the allegations in paragraph 21 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

22.     The rules, regulations, policies, and procedures of Doctor FUNK or Doctor

JOHN DOE were implemented by and through WEXFORD and IDOC employees, including

the individual defendant medical care providers, who were responsible for the medical care

of inmates at Stateville NRC, including plaintiff.

**ANSWER: Defendants make no answer to the allegations in paragraph 22 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

23.     Medical Director FUNK or JOHN DOE was at all times relevant to the events at

issue in this case acting under color of law.

**ANSWER: Defendants make no answer to the allegations in paragraph 23 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

24.     At all times mentioned herein, defendants ARTHUR FUNK, MD, Medical

Director JOHN DOE, MD, D. SCHWARZ, MD, STEVEN TALLER, MD, JOHN DOE, MD,

SARAH L. MAYS, and Nurse MORRIS, RN were each an employee of WEXFORD or, in the

alternative, of the IDOC, employed to provided medical services to inmates, including plaintiff,

at Stateville NRC.

**ANSWER: Defendants make no answer to the allegations in paragraph 24 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

25.     Defendants ARTHUR FUNK, MD, Medical Director JOHN DOE, MD,

D. SCHWARZ, MD, STEVEN TALLER, MD, JOHN DOE, MD, SARAH L. MAYS,

and Nurse MORRIS, RN were each acting under color of state law and within the scope of their

employment by WEXFORD at Stateville NRC. They are being sued in their individual/personal

capacity.

**ANSWER: Defendants make no answer to the allegations in paragraph 25 because the Court**

**dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

### Parties from Illinois River Correctional Center

26.     Illinois River Correctional Center is a medium security adult male correctional

facility managed by the IDOC, located in Canton, Illinois.

**ANSWER: Defendants admit the allegations in paragraph 26.**

27.     Upon information and belief, WALTER NICHOLSON was employed by the

IDOC as the Warden at Illinois River in 2012, and therefore functioned as Warden for part of

the time that Mr. OLLISON was incarcerated there.

**ANSWER: Defendants make no answer to the allegations in paragraph 27 because the Court**

**dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

28.     GREG GOSSETT was employed by the IDOC as the Warden at Illinois River at

all other times relevant to the events in this complaint.

**ANSWER: Defendants admit the allegations in paragraph 28.**

29.     As Chief Administrative Officer, Wardens NICHOLSON and GOSSETT were

responsible for the overall operation, policies, and management of Illinois River. Included in

their responsibilities was the hiring and training of all personnel employed by IDOC at Illinois

River, and the formulating of rules, regulations, and policies governing its employees and

inmates.

**ANSWER: Defendants admit that Defendant Gossett was employed as Warden at Illinois River during the relevant timeframe. Defendants deny that paragraph 29 fully and accurately describes Defendant Gossett's duties as Warden. Defendants make no answer to the allegations regarding Defendant Nicholson because the Court dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

30. As Chief Administrative Officers, Wardens NICHOLSON and GOSSETT also promulgated rules, regulations, policies, and procedures at Illinois River for the provision of certain medical care. This included the medical screening of and the administration of medical services to inmates at Illinois River by medical care providers employed by the IDOC, as well as by medical care providers employed by WEXFORD.

**ANSWER: Defendants admit that Defendant Gossett was employed as Warden at Illinois River during the relevant timeframe. Defendants deny that paragraph 30 fully and accurately describes Defendant Gossett's duties as Warden. Defendants make no answer to the allegations regarding Defendant Nicholson because the Court dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

31. Wardens NICHOLSON and GOSSETT were responsible for reducing strife and enhancing harmony in the operation of Illinois River by promulgating and enforcing rules, regulations, and policies for the effective and equitable resolution of inmate problems, complaints, and grievances.

**ANSWER: Defendants admit that Defendant Gossett was employed as Warden at Illinois River during the relevant timeframe. Defendants deny that paragraph 31 fully and accurately describes Defendant Gossett's duties as Warden. Defendants make no answer to the allegations regarding Defendant Nicholson because the Court dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

32.     As a prisoner and ward of the state, Mr. OLLISON's guardian was the Warden of Illinois River, who was in charge of his medical care and medical decisions while he was incarcerated there.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.**

33.     Wardens NICHOLSON and GOSSETT were at all times relevant to the events at issue in this case acting under color of law.

**ANSWER: Defendants admit that Defendant Gossett was acting under color of law. Defendants make no answer to the allegations regarding Defendant Nicholson because the Court dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

34.     Doctor CARLA B. GREBY was a physician employed by WEXFORD as the Medical Director at Illinois River from July 25, 2010, though January 31, 2014.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34.**

35.     GREBY is no longer licensed to practice medicine in Illinois, in that her physician's license was not renewed in 2014, a few weeks after Mr. OLLISON's admission into the hospital through the emergency room.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.**

36.     As Medical Director of Illinois River, Doctor GREBY was the final policymaker for WEXFORD and had final authority to and did promulgate rules, regulations, policies, and procedures for the provision of medical care to inmates, including medical screening and care of inmates and administration of medication to the inmates by medical care providers such as nurses, doctors, and certified medical technicians employed at Illinois River.

9

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36.**

37.     The rules, regulations, policies, and procedures of Doctor GREBY were implemented by and through WEXFORD and IDOC employees including the individual defendant medical care providers, who were responsible for the medical care of inmates at Illinois River, including plaintiff.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37.**

38.     As Medical Director, Doctor GREBY had the authority to refer inmates to medical specialists and to order laboratory and clinical services whether available inside the prison facility or outside the prison facility.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38.**

39.     Medical Director GREBY was at all times relevant to the events at issue in this case acting under color of law.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39.**

40.     At all times mentioned herein, defendants CARLA B. GREBY, MD, REBECCA S. EINWOHNER, MD, LISA BISHOP, CONNIE SWORD, EDNA L. GREENHAGEN, RN, SHIRLEY LAW, RN, C. PELLITER, C. REYNOLDS, NURSE CANDY "DOE," KANDIS CRITZ, RN, NURSE DAVID "DOE," K. BARKER, LPN, F. MAURICE, RN, and J. EASLEY, LPN, were each an employee of WEXFORD or, in the alternative, of the IDOC, employed to provided medical services to inmates, including plaintiff, at Illinois River.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40.**

41.      Defendants CARLA B. GREBY, MD, REBECCA S. EINWOHNER, MD, LISA BISHOP, CONNIE SWORD, EDNA L. GREENHAGEN, RN, SHIRLEY LAW, RN, C. PELLITER, C. REYNOLDS, NURSE CANDY "DOE," KANDIS CRITZ, RN, NURSE DAVID "DOE," K. BARKER, LPN, F. MAURICE, RN, and J. EASLEY, LPN were each acting under color of state law and within the scope of their employment by WEXFORD. They are being sued in their individual/personal capacity.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41.**

42.      At all times mentioned herein, defendants ROBBIE JOHNSON and C. WISE were employees of the IDOC at Illinois River. JOHNSON was a grievance officer and WISE was a prison counselor.

**ANSWER: Defendants admit that Defendant Johnson was employed as a Grievance Officer at Illinois River during the relevant timeframe. Defendants admit that Defendant Wise was employed as a Correctional Counselor at Illinois River during the relevant timeframe.**

43.      Defendants JOHNSON and WISE were each acting under color of state law and within the scope of their employment by IDOC. They are being sued in their individual/personal capacity.

**ANSWER: Defendants admit that Defendants Gossett and Wise were acting under color of law. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 43.**

**State of Illinois**

44.      At all times herein mentioned, the State of Illinois is empowered and directed to pay any judgment for compensatory damages, and associated attorneys' fees and costs, for which any State employee acting within the scope of his/her employment, is found liable. Accordingly, the State of Illinois is named herein as an indemnification party.

**ANSWER: Defendants make no answer to the allegations in paragraph 44 because the Court found that they are a "mere legal conclusion that does not purport to make a substantive claim." [Doc. 133] (internal citations omitted). The Court also found that "a federal court cannot enter a money judgment requiring the State of Illinois to indemnify its employees." [Doc. 133].**

## FACTUAL ALLEGATIONS

45.      Plaintiff, ERIC OLLISON, is 32 years old.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45.**

46.      All acts alleged herein occurred while plaintiff, ERIC OLLISON, was in the custody of the Illinois Department of Corrections and was incarcerated at Stateville Reception and Classification Center (Stateville NRC) and Illinois River Correction Center (Illinois River).

**ANSWER: Defendants admit the allegations in paragraph 46.**

### Plaintiff's medical condition was serious at intake

47.      Prior to his arrival at Stateville NRC for intake and assignment, Mr. OLLISON was incarcerated at Kankakee County Detention Center in Kankakee, Illinois. At that time, he received consistent and competent medical care, from a primary care physician and from a nephrologist.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47.**

48.     In March 2011, Mr. OLLISON was diagnosed by a nephrologist with chronic kidney disease (CKD) Stage III (moderate), proteinuria, nephrotic syndrome, and hyperlipidemia, in addition to the hypertension he had suffered for years.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48.**

49.     While at the Kankakee County Detention Center, Mr. OLLISON was given frequent laboratory work-ups, and his nephrologist met with him every month or two, to examine him and to regulate his medications, in order to assure that his kidney disease, proteinuria, nephrotic syndrome, hyperlipidemia, and hypertension were well-managed.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49.**

50.     When Mr. OLLISON arrived at Stateville NRC in December 2011, Registered Nurse SARAH L. MAYS interviewed Mr. OLLISON for his medical history and Doctor D. SCHWARZ and/or Doctor STEVEN TALLER and/or Doctor JOHN DOE performed a physical examination.

**ANSWER: Defendants make no answer to the allegations in paragraph 50 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

51.     Mr. OLLISON told Nurse MAYS and Doctor SCHWARZ, TALLER, and/or JOHN DOE that he had a kidney condition, but they were deliberately indifferent to his serious medical condition and they failed to note on his chart that he had CKD, chronic kidney disease, as well as proteinuria, nephrotic syndrome, and hyperlipidemia, and thus needed a referral to a specialist.

**ANSWER: Defendants make no answer to the allegations in paragraph 51 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

52.     Once the initial records failed to show that Mr. OLLISON had these chronic conditions, other medical personnel were deliberately indifferent to his serious medical needs and also failed independently to determine that these chronic conditions existed. The prison medical personnel after intake relied on the erroneous intake records.

**ANSWER: Defendants make no answer to the allegations in paragraph 52 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

53.     Once the initial records failed to show that Mr. OLLISON had these chronic conditions, other medical personnel were deliberately indifferent to his serious medical needs and also failed independently to determine that these chronic conditions existed. The prison medical personnel after intake relied on the erroneous intake records.

**ANSWER: Defendants make no answer to the allegations in paragraph 53 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

54.     Nurse MAYS, Doctors SCHWARZ, TALLER, and/or JOHN DOE all failed to obtain the records with Mr. OLLISON's medical history from Kankakee County Detention Center, which documented the chronic kidney disease assessment and the treatment plan.

**ANSWER: Defendants make no answer to the allegations in paragraph 54 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

55.     On January 16, 2012, Mr. OLLISON was transferred from Stateville NRC to Illinois River. Registered Nurse MORRIS at Stateville NRC prepared the transfer screening report, and despite the fact that the laboratory reports showed that Mr. OLLISON had Stage III chronic kidney disease, he/she failed to note it.

**ANSWER: Defendants make no answer to the allegations in paragraph 55 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

56.     Nurse MORRIS' failure to note the chronic kidney disease meant that medical personnel who subsequently treated Mr. OLLISON were not immediately alerted to this serious medical condition.

**ANSWER: Defendants make no answer to the allegations in paragraph 56 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

57.     MARCUS HARDY, who was employed by the IDOC as the Warden, or Chief Administrative Officer of Stateville NCR, was responsible for the overall operation of the facility. This included the medical screening of and the administration of medical services to inmates at Stateville NRC by medical care providers employed by the IDOC, as well as by medical care providers employed by WEXFORD.

**ANSWER: Defendants make no answer to the allegations in paragraph 57 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

58.     As a supervisor, Warden HARDY was aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to Mr. OLLISON.

**ANSWER: Defendants make no answer to the allegations in paragraph 58 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

59.     Medical Director ARTHUR FUNK or Medical Director JOHN DOE supervised the medical care for inmates at Stateville NRC, and as Medical Director of the intake facility had the responsibility of assuring that the intake information and records were complete and accurate and contained all previous records for inmates from transferring institutions, and that the information and records forwarded to the receiving correctional institution were also complete and accurate.

**ANSWER: Defendants make no answer to the allegations in paragraph 59 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

60.     Medical Director ARTHUR FUNK or Medical Director JOHN DOE failed in their responsibility of assuring that the intake information and records were complete and accurate and contained all previous records for inmates from transferring institutions, and that the information and records forwarded to the receiving correctional institution were also complete and accurate.

**ANSWER: Defendants make no answer to the allegations in paragraph 60 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

61.     The deliberate indifference of WEXFORD, and the employees and agents of the IDOC and WEXFORD at Stateville NRC, to report and plan for the treatment of plaintiff's serious medical condition was a proximate cause of his subsequent renal failure and other injuries.

**ANSWER: Defendants make no answer to the allegations in paragraph 61 because the Court dismissed the claims against the Stateville Defendants on November 29, 2016. [Doc. 133].**

**There was deliberate indifference at Illinois River to plaintiff's serious medical condition**

62.     Registered Nurse SHIRLEY LAW performed the intake reception screening at Illinois River, assisted by C. REYNOLDS and C. PELLITERE. Their notes were erroneous, saying that Mr. OLLISON's "chart [was] received at IRCC," that Mr. OLLISON had "no significant history," and that his "problem list was updated."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62.**

63.     Mr. OLLISON told the intake staff that he had a kidney problem, but LAW, REYNOLDS, and PELLITERE were deliberately indifferent to his serious medical condition and did not note it in the chart.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63.**

64.     Doctor CARLA B. GREBY was the Medical Director at Illinois River. She was Mr. OLLISON's primary care physician and as such, she monitored and was responsible for his medical care while he was incarcerated at Illinois River.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64.**

65.     Doctor GREBY's specialty was internal medicine. She had no training or experience in nephrology.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65.**

66.     Doctor GREBY signed the initial laboratory results of January 27, 2012, for Mr. OLLISON, which contained abnormal readings, including an elevated creatinine level, a low BUN/creatinine reading, and an eGFR reading that indicated Stage III chronic kidney disease (CKD).

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66.**

67.     Doctor GREBY also signed the laboratory results of February 2, 2012, which showed a high level of urine protein in Mr. OLLISON's system.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67.**

68.     Throughout Mr. OLLISON's medical chart, Doctor GREBY listed only hypertension and hyperlipidemia as his chronic medical conditions.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68.**

69.     Doctor GREBY signed laboratory reports with abnormal readings on March 20, 2012, and July 11, 2012, but took no action.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69.**

70.     There is no indication that any laboratory tests were done for eight months, from July 2012 until March 2013.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70.**

71.     On March 7, 2013, laboratory tests showed several seriously abnormal readings, that is, an elevated BUN reading, an elevated creatinine level, an elevated chloride level, a low BUN/creatinine reading, a low protein level, and a low albumin level. There was also a high level of urine protein. Doctor GREBY signed the report.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71.**

72.     On March 12, 2013, Doctor GREBY noted in the progress notes the elevated creatinine level of 4.07 and, for the first time, acknowledged and noted that Mr. OLLISON has chronic kidney disease.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72.**

73.     Doctor GREBY referred Mr. OLLISON to Doctor REBECCA S. EINWOHNER, a nephrologist.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73.**

74.     On March 21, 2013, Doctor GREBY wrote in the progress notes that she wanted to obtain "old records re kidney disease," and noted her new discovery that Mr. OLLISON has a "history of kidney disease." She noted that he had edema in the ankles.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74.**

75.     Doctor EINWOHNER requested and Doctor GREBY ordered a kidney ultrasound.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75.**

76.     Laboratory tests on March 27, 2013, showed a creatinine level of 4.52.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76.**

77.     On April 10, 2013, Doctor GREBY noted that she is following up on the kidney disease, and she referred to obtaining "old records" to confirm the etiology of the disease.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77.**

78.     On April 17, 2013, and April 22, 2013, Doctor GREBY noted again that she would "await old records."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78.**

79.     Doctor EINWOHNER prepared two reports, on March 21, 2013, and April 15, or

16, 2013, but did not become actively involved in developing and overseeing a treatment plan

for Mr. OLLISON's worsening chronic kidney disease.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations in paragraph 79.**

80.     Neither Doctor GREBY nor Doctor EINWOHNER made any efforts to determine

the etiology of Mr. OLLISON's chronic kidney disease, or develop a comprehensive treatment

plan to control the disease, thus demonstrating deliberate indifference.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations in paragraph 80.**

81.     After the two spurts of interest, on March 21, 2013, and April 15, or 16, 2013,

Doctor E1NWOHNER seems to have dropped out of the picture. No nephrologist was

monitoring Mr. OLLISON's condition.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in paragraph 81.**

82.     Mr. OLLISON had a routine appointment with Doctor GREBY on July 25,

2013, but she ordered no laboratory tests and only noted as chronic problems his

hypertension and his lipids level, not the chronic kidney disease.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in paragraph 82.**

83.     LISA BISHOP, the Illinois River Medical Records Director, made several

ineffective written requests in April, May, and June 2013 for prior records from Kankakee

County Jail for Mr. OLLISON. She was not diligent in her attempts to obtain those records.

She was indifferent to the importance and the urgency of obtaining those records.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83.**

84.　　After the requests by LISA BISHOP for prior records from Kankakee County Jail, and after several notes by Doctor GREBY that she was awaiting those records, Doctor GREBY noted on July 15, 2013, that she received the records.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.**

85.　　After receiving the records, Doctor GREBY showed no concern about Mr. OLLISON's chronic kidney disease, and she took no additional action.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85.**

### Deliberate indifference by WEXFORD medical personnel at Illinois River caused Mr. OLLISON's serious medical condition to quickly worsen

86.　　On November 18, 2013, Mr. OLLISON's condition started going downhill. He complained to Doctor GREBY that he was "sluggish." Over the next **six** weeks, he persistently voiced his physical complaints, as he began to feel worse and worse.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86.**

87.　　Mr. OLLISON complained that he was tired all the time, that he felt lightheaded and dizzy, and that he had a dry mouth and a bad medicine or salty taste in his mouth that would not go away. He also complained that he was vomiting all the time, "for weeks," that his face and legs were swollen, and that he had the chills and shortness of breath. He also complained that he would go for days without urinating.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87.**

88.      Mr. OLLISON voiced his complaints to Physician's Assistant CONNIE SWORD; Nurse CANDY "DOE," believed to be Registered Nurse KANDIS CRITZ; Licensed Practical Nurse K. BARKER; Registered Nurse F. MAURICE; and Licensed Practical Nurse J. EASLEY, among others.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88.**

89.      Defendants were deliberately indifferent to Mr. OLLISON's symptoms, which were classic symptoms of renal failure.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89.**

90.      Doctor GREBY and Physician Assistant SWORD failed to order any laboratory tests. The chart does not show any laboratory tests ordered in 2013 after April 12, 2013, despite Mr. OLLISON's complaints.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90.**

91.      During this period, there was no referral to a nephrologist.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91.**

92.      Defendants GREBY, EINWOHNER, SWORD, Nurse CANDY "DOE," CRITZ, Nurse DAVE "DOE," BARKER, MAURICE, and EASLEY were all deliberately indifferent and failed to take seriously Mr. OLLISON's failing medical condition.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92.**

93.     Defendant medical personnel at Illinois River, at Doctor GREBY's direction, only continued to take Mr. OLLISON's blood pressure readings on a regular basis. When he exhibited clear symptoms of renal failure, defendants treated Mr. OLLISON for acid indigestion and heartburn. They did nothing to treat his serious kidney condition.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93.**

### Deliberate indifference by IDOC personnel at Illinois River caused Mr. OLLISON's serious medical condition to quickly worsen

94.     Mr. OLLISON filed at least three grievances, on December 22, 2013, December 28, 2013, and January 8, 2014. He was becoming more and more desperate.

**ANSWER: Defendants admit that Plaintiff filed grievances dated December 22, 2013 and December 26, 2013.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94.**

95.     In his December 22, 2013, grievance, Mr. OLLISON stated, "I am basically begging you to have myself fully checked out to make sure that nothing is wrong. I am only 30 years old there is no way my body should be reacting this way."

**ANSWER: Defendants admit that Plaintiff wrote the above-described statement in his grievance to explain his concern about the side effects he was experiencing from his newly prescribed medication.**

96.     Counselor C. WISE, Grievance Officer ROBBIE JOHNSON, the Chief Administrative Officer, believed to be Warden GREG GOSSETT, and Director of Nursing EDNA L GREENHAGEN all dismissed the December 22, 2013, complaint as "moot," and not an emergency.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96.**

97.     In his December 26, 2013, grievance, Mr. OLLISON complained about high blood pressure, vomiting for three weeks, lightheadedness, chest pains, dizziness, shivers, swollen face, not using the bathroom regularly (using the toilet now every three days), and no energy. He complained that Physician's Assistant SWORD was not documenting his complaints. SWORD listed his complaints that day in his chart as "bad taste in mouth," "feels tired," and "HTN" (hypertension).

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97.**

98.     Mr. OLLISON's December 26, 2013, grievance was ignored.

**ANSWER: Defendants deny the allegations in paragraph 98.**

99.     In his January 8, 2014, grievance, Mr. OLLISON reported the same persistent symptoms. He complained that his blood work and urine sample were lost by Nurse DAVE "DOE," and Nurse CANDY "DOE," believed to be Registered Nurse KANDIS CRITZ. He complained that his unrelenting vomiting was a serious problem. He complained that the medical staff was making a joke of everything. He complained that Physician's Assistant SWORD would not treat him for anything; all that she ever did was arrange for his blood pressure to be checked.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99.**

100.     The Chief Administrative Officer (believed to be GREG GOSSETT) said in an Emergency Review that the January 8, 2014, grievance did not constitute an emergency. On January 14, 2014, two days before Mr. OLLISON was hospitalized, Counselor C. WISE, Grievance Officer ROBBIE JOHNSON, and Director of Nursing EDNA L. GREENHAGEN all dismissed the January 8, 2014, complaint as "moot," and not an emergency.

24

**ANSWER: Defendants deny the allegations in paragraph 100.**

101.     Apparently to cover his tracks, the Chief Administrative Officer (believed to be GREG GOSSETT) stated on March 23, 2014, that the January 8, 2014, complaint was not an emergency. This was more than two months after Mr. OLLISON suffered renal failure, seizures, brain injury, and other system failures described below.

**ANSWER: Defendants deny the allegations in paragraph 101.**

102.     WALTER NICHOLSON during his term as Warden and GREG GOSSETT during his term as Warden were responsible for the overall operation of Illinois River. This included the medical screening of and the administration of medical services to inmates at Illinois River by medical care providers employed by the IDOC, as well as by medical care providers employed by WEXFORD.

**ANSWER: Defendants admit that Defendant Gossett was employed as Warden at Illinois River during the relevant timeframe. Defendants deny that paragraph 102 fully and accurately describes the Defendant Gossett's duties as Warden. Defendants make no answer to the allegations regarding Defendant Nicholson because the Court dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

103.     As supervisors, Wardens NICHOLSON and GOSSETT were aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to Mr. OLLISON.

**ANSWER: Defendants deny the allegations in paragraph 103 related to Defendant Gossett. Defendants make no answer to the allegations regarding Defendant Nicholson because the Court dismissed the claims against Defendant Nicholson on November 29, 2016. [Doc. 133].**

104.     The IDOC employees had ample notice that Mr. OLLISON had a serious medical condition, but they were deliberately indifferent to his condition.

25

**ANSWER:** Defendants deny the allegations in paragraph 104.

### Deliberate indifference at Illinois River by WEXFORD medical personnel caused Mr. OLLISON's serious medical condition to become critical

105.     On December 30, 2013, Mr. OLLISON was sitting in his chair in his cell when, all of a sudden, he started feeling lightheaded and queasy. He went to the toilet and started vomiting as he had been doing repeatedly, some times several times a day. Every time he informed the nurse that he had vomited, he was told that his appointment with the physician's assistant (SWORD) was on January 2, 2014, and that he would have to wait until then for additional medical attention.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105.

106.     After repeated vomiting on December 30, 2013, Mr. OLLISON's stomach became knotted up, and he was writhing on the floor, holding his stomach in pain. Mr. OLLISON's cellmate hit the emergency button.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106.

107.     The corrections officer came by and asked Mr. OLLISON if he could get up. Mr. OLLISON slowly got up and sat in the chair. He started shaking and shivering uncontrollably.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107.

108.     When the nurse finally came by, believed to be Licensed Practical Nurse J. EASLEY from the records, she was sarcastic. She gave Mr. OLLISON some Ibuprofen and Maalox.

26

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108.**

109. Mr. OLLISON pleaded with Physician's Assistant CONNIE SWORD and Nurse CANDY "DOE," believed to be Registered Nurse KANDIS CRITZ, to do some tests, some blood work, anything, to find out what was wrong with him.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109.**

110. Mr. OLLISON asked to see Doctor GREBY, but was told that he would have to wait for his next regularly scheduled appointment with her. Mr. OLLISON was in distress.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110.**

111. On January 7, 2014, Doctor GREBY finally ordered that laboratory tests be done. Blood and urine samples were taken on January 8, 2014, but were lost by Nurse CANDY "DOE," believed to be Registered Nurse KANDIS CRITZ, and Nurse DAVE "DOE."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111.**

112. The tests were never done and no one, not Doctor GREBY, not Physician's Assistant SWORD, and not any of the registered nurses or licensed practical nurses, even noticed.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112.**

113. On January 8, 2014, Physician's Assistant SWORD came by to ask if anyone had flu symptoms. Mr. OLLISON complained that he was vomiting and was lightheaded and

dizzy. SWORD said that Mr. OLLISON's medications would not make him vomit and she dismissed his complaints.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113.**

114.     On January 16, 2014, Mr. OLLISON saw Physician's Assistant SWORD. He complained that he had been vomiting for weeks. Complete blood count (CBC) and comprehensive metabolic panel (CMP) tests were ordered to be completed immediately.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1114.**

115.     SWORD contacted Doctor EINWOHNER with the laboratory test results (which are missing from the chart provided by IDOC to plaintiff). It does not appear, however, that Dr. EINWOHNER examined Mr. OLLISON.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115.**

116.     According to the chart, upon reviewing the laboratory results, Doctor EINWOHNER "suggested Pt be directly admitted to hospital." Doctor GREBY was contacted and she concurred.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116.**

**Mr. OLLISON suffered acute renal failure and other injuries**

117.     On January 16, 2014, Mr. OLLISON was taken in custody to the emergency room at Graham Hospital in Canton, Illinois. He was suffering from acute renal failure.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117.**

118.     Laboratory results on that date at the Graham Hospital show that Mr. OLLISON

creatinine level was critically high (32.0, where normal is .80 - 1.30) and his hemoglobin level was

critically low (6.4, where normal is 13.0 - 16.9). His blood urea nitrogen (BUN) was abnormal (184,

where normal is 6 - 20) and his estimated glomerular filtration rate (eGFR) indicated renal

failure (2, when less than 15 indicates renal failure).

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in paragraph 118.**

119.     Because Graham Hospital is a rural hospital that could not treat Mr.

OLLISON's severely acute medical problems, he was moved that same day, January 16, 2014,

to St. Francis Medical Center in Peoria, Illinois, a tertiary hospital.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in paragraph 119.**

120.     On January 16, 2014, when Mr. OLLISON suffered acute renal failure, he

began hemodialysis. His acute renal failure then lead to other complications.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in paragraph 120.**

121.     On January 19, 2014, Mr. OLLISON developed paralysis on his left side,

complicated by the onset of seizures and status epilepticus. He thereafter suffered acute respiratory

failure, pneumonia, uncontrolled blood pressure, pancytopenia, pneumomediastinum, and

bilateral anterior pneumotheorax, among other conditions.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in paragraph 121.**

122.     Mr. OLLISON required continuous veno-venous hemofiltration (CVVH) on

January 22, 2014, and tracheostomy and gastrostomy on February 7, 2014. An MRI of his head

on January 27, 2014, showed bilateral cerebral cortical laminar necrosis, and a CT of his head on February 11, 2014, showed progression to a bilateral parietal infarction.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122.**

123.    When he was at St. Francis Medical Center, Mr. OLLISON was considered to have suffered irreversible brain injury and had a poor prognosis for any meaningful neurological recovery. He was on ventilator life-support and had a g-tube for feeding.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123.**

124.    As a prisoner and ward of the state, Mr. OLLISON's guardian was the Warden of Illinois River, GREG GOSSETT, who was in charge of his medical care and medical decisions.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124.**

125.    Mr. OLLISON's mother, Geraldine Joseph, his children, and other family members were not informed about Mr. OLLISON's renal failure. They found out that he was hospitalized when, out of concern, they called the prison to find out where he was.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125.**

126.    Thus, at the end of January 2014, two weeks after he was hospitalized, Mr. OLLISON's mother, children, and other family members were first told that he was in a hospital, in a coma.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126.**

127.    A Do Not Resuscitate policy was instituted for Mr. OLLISON, against the
wishes of his mother and other family members. Mr. OLLISON's family was told that he would
be low-functioning and unable to care for himself and that "the plug should be pulled."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the
truth of the allegations in paragraph 127.**

128.    On February 25, 2014, Mr. OLLISON was moved to MRL Specialty Hospital, in
Hinsdale, Illinois, where his respiratory failure resolved and his encephalopathy improved. His
swallowing function improved to the extent that he could resume eating.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the
truth of the allegations in paragraph 128.**

129.    On March 20, 2014, Mr. OLLISON was admitted to University of Illinois
Hospital and Health Sciences System in Chicago, Illinois to obtain physical therapy and
occupational therapy to work on mobility and self-care issues. Mr. OLLISON was released on
April 3, 2014.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the
truth of the allegations in paragraph 129.**

130.    Although he has made a remarkable recovery, Mr. OLLISON has suffered
permanent injuries as a result of the deliberate indifference of defendants to plaintiff's serious
medical needs, including residual weakness and the loss of the full functioning of his limbs,
as well as the loss of some mental functions.

**ANSWER: Defendants deny the allegations in paragraph 130.**

131.    Mr. OLLISON's condition should have been properly diagnosed, controlled,
and managed by WEXFORD and defendant employees of WEXFORD and IDOC, and he

should have been under the care of a nephrologist the entire time he was incarcerated at the IDOC facilities.

**ANSWER: Defendants deny the allegations in paragraph 131.**

132.    WEXFORD and defendant employees of WEXFORD and IDOC failed to respond in a timely manner to serious, life-threatening conditions to Mr. OLLISON, causing him permanent injury, loss of normal life, and extensive pain and suffering.

**ANSWER: Defendants deny the allegations in paragraph 132.**

133.    By reason of the above-described acts and omissions of defendants, plaintiff sustained physical and emotional injuries, and suffered great physical, mental, and emotional pain and suffering, all to his damage, in an amount to be ascertained by a jury at trial.

**ANSWER: Defendants deny the allegations in paragraph 133.**

134.    The aforementioned acts of defendants were willful, wanton, malicious, oppressive, and done with reckless indifference to and/or callous disregard for plaintiff's rights and justify the awarding of exemplary and punitive damages in an amount to be ascertained by a jury at trial.

**ANSWER: deny the allegations in paragraph 134.**

135.    By reason of the above-described acts and omissions of defendants, plaintiff was required to retain an attorney to institute, prosecute and render legal assistance to him in the within action so that he might vindicate the loss and impairment of his rights. By reason thereof, plaintiff requests payment by defendants, and each of them, of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988, the Equal Access to Justice Act, or any other provision set by law.

**ANSWER: Defendants deny the allegations in paragraph 135.**

<u>COUNT I</u>
<u>Violation of Eighth and Fourteenth Amendment -</u>
<u>Defendants' Deliberate Indifference to Plaintiff's Serious Medical Condition</u>

136.    Plaintiff, ERIC OLLISON, hereby incorporates and realleges paragraphs 1 - 135, as through set forth herein in their entirety.

**<u>ANSWER:</u>  Defendants incorporate by reference their responses to paragraphs 1 - 135 of the factual summary as though fully set forth herein.**

137.    As alleged in more detail above, defendants knew or should have known that Mr. OLLISON was in serious need of medical care, yet defendants were deliberately indifferent to his serious medical needs, even though timely and appropriate treatment for Mr. OLLISON's serious medical needs was feasible.

**<u>ANSWER:</u> Defendants deny the allegations in paragraph 137.**

138.    Throughout his incarceration with the IDOC, defendants failed to provide Mr. OLLISON with the proper continuity of care that his kidney disease and other ailments required. Defendants failed to provide him with the necessary medical specialists.

**<u>ANSWER:</u> Defendants deny the allegations in paragraph 138.**

139.    In November 2013 through January 2014, defendants were deliberately indifferent to Mr. OLLISON's persistent cries for help, when it was clear or should have been clear that he was suffering from acute renal failure and was in distress.

**<u>ANSWER:</u> Defendants deny the allegations in paragraph 139.**

140.    The conduct of defendants, both their acts of omission and commission, proximately caused plaintiff's temporary and permanent physical and emotional injuries, as set forth more fully above.

**<u>ANSWER:</u> Defendants deny the allegations in paragraph 140.**

141.     Defendants deprived plaintiff of the rights, privileges and immunities secured to him by the Eighth and Fourteenth Amendments to the Constitution of the United States and laws enacted thereunder. Therefore, defendants are jointly and severally liable to plaintiff pursuant to 42 U.S.C. §1983.

**ANSWER: Defendants deny the allegations in paragraph 141.**

**COUNT II**
***Monell* Claim Against WEXFORD HEALTH SOURCES, INC.**

142.     Plaintiff, ERIC OLLISON, hereby incorporates and realleges paragraphs 1 - 135, as through set forth herein in their entirety.

**ANSWER:  Defendants incorporate by reference their responses to paragraphs 1 - 135 of the factual summary as though fully set forth herein.**

143.     The constitutional violations set forth above were committed pursuant to the unconstitutional policies and practices of WEXFORD, acting under color of law. There were express policies and implied policies and widespread practices so prevalent as to comprise corporate policy that caused the constitutional violations.

**ANSWER: As the allegations in paragraph 143 are not directed to Defendants, no response is required.**

144.     As a matter of both policy and practice, WEXFORD directly encouraged, and thereby was the moving force behind, the constitutional violations at issue here by failing to adequately train, supervise, and control its employees, such that its failure to do so manifested deliberate indifference.

**ANSWER: As the allegations in paragraph 144 are not directed to Defendants, no response is required.**

145.     As a matter of both policy and practice, WEXFORD facilitated the very type of misconduct at issue here by failing to adequately supervise and hold accountable its employees, thereby leading them to believe that their actions will never be scrutinized and, in that way, directly encouraged continuing abuses such as those which affected plaintiff.

**ANSWER: As the allegations in paragraph 145 are not directed to Defendants, no response is required.**

146.     The deficiencies in the policies, procedures, and practices have been documented by well-researched and highly respected studies and reports. In the case of *Lippert v. Godinez*, 10 C 4603, the Court appointed an expert, Dr. Ronald Shansky, pursuant to Fed. R. Evid. 706, to "assist the court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy." The 405-page report (filed at 10 C 4603, Document 339) devotes 38 pages (pages 89 - 126) to Stateville NRC and 37 pages (pages 249 - 285) to Illinois River. The report describes persistent, systemic problems in the institutions. Regarding Stateville NRC, the report states:

> In summary, the healthcare program at NRC suffers from lack of leadership, weak infrastructure, disorganization, resource shortages and absent oversight.
> . . .
> The medical records are disorganized and not conducive to providing adequate services. There are tabs in the charts, and there is a medical records department, but nothing is properly filed no matter how long the patients stay at NRC.

10 C 4603, Document 339 at 93.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 146.**

147.     Regarding Illinois River, the report cites:

> [S]everal highly problematic cases . . . that resulted in actual harm to patients . . . some of which were under the care of the former Medical Director who we understand no longer works for Wexford.

10 C 4603, Document 339 at 252.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147.**

148.    The statement regarding "the former Medical Director" presumably refers to Doctor CARLA B. GREBY, who upon information and belief was relieved of her duties as Medical Director a short time after Mr. OLLISON's tragic medical decline.

**ANSWER: As the allegations in paragraph 148 are not directed to Defendants, no response is required.**

149.    Regarding chronic diseases, the report pertaining to Illinois River notes deficiencies: "There must be clinical oversight of the quality of care provided, both locally by a qualified Medical Director, and centrally by Wexford." 10 C 4603, Document 339 at 283.

**ANSWER: As the allegations in paragraph 149 are not directed to Defendants, no response is required.**

150.    Prison monitoring reports from the John Howard Association of Illinois for Stateville NRC (2011, 2012, and 2014) and for Illinois River (2012) also highlight systemic problems at the institutions.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150.**

151.    At all times material to this complaint, there existed at Stateville NRC and Illinois River the following practices, policies, and customs attributable to WEXFORD:

a)    Failure to establish an intake system that assures that the intake information and records are complete and accurate and contain all previous records for inmates from transferring institutions.

b)      Failure to establish a medical records system that maintains complete, accurate, and organized records.

c)      Failure to establish a medical records system that assures that the information and records forwarded to a receiving correctional institution (whether inter-system or infra-system) are complete and accurate.

d)      Failure to provide inmates suffering from acute and life-threatening medical conditions with the level of medical care and attention required.

e)      Failure to provide inmates with timely access to health care.

f)      Failure to implement a program for medical assessment of the level of medical care required by inmates that takes into consideration staffing levels and capabilities and prison population numbers.

g)      Failure to provide inmates with serious and life-threatening medical conditions prompt access to primary care physicians.

h)      Failure to provide inmates with serious and life-threatening medical conditions with prompt access to appropriate medical specialists.

i)      Failure to institute clinical oversight of the quality of care.

j)      Failure to provide prompt accessibility of laboratory and diagnostic test results and adequate communication of those results to the requesting medical staff.

k)      Failure to implement an adequate system for collection, distribution and diagnosis of medical care complaints and symptoms.

l)      Failure to train employees in the recognition and handling of life-threatening emergency medical situations.

m)      Failure to make decisions based on medical necessity instead of economics, i.e., the costs of diagnostic tests and referrals to specialists.

**ANSWER: As the allegations in paragraph 151 are not directed to Defendants, no response is required.**

152.    The actions of the individual defendants as alleged in this complaint were done pursuant to, and as a result of, one or more of the above practices, policies, and customs of WEXFORD and its employees.

**ANSWER: As the allegations in paragraph 152 are not directed to Defendants, no response is required.**

153.    The actions of the individual defendants as alleged in this complaint, and the actions of WEXFORD and its supervisory employees in failing to train, supervise, and discipline employees with respect to said actions, resulted in recurring situations at Stateville NRC and Illinois River, and not isolated instances of failure to act.

**ANSWER: As the allegations in paragraph 153 are not directed to Defendants, no response is required.**

154.    The practices, policies, and customs described above were widespread, permanent, and well-settled, and were known, or should have been known, to the policy-makers of the WEXFORD.

**ANSWER: As the allegations in paragraph 154 are not directed to Defendants, no response is required.**

155.    The policy-makers of WEXFORD were instrumental in maintaining, overlooking, and perpetuating the unconstitutional practices, policies and customs described above.

**ANSWER: As the allegations in paragraph 155 are not directed to Defendants, no response is required.**

156.    By their inaction and failure to correct the above-described practices, policies, and customs, WEXFORD policy-makers tacitly approved and thus indirectly authorized the type of misconduct plaintiff complains of herein.

**ANSWER: As the allegations in paragraph 156 are not directed to Defendants, no response is required.**

157.    Through its practices, policies, and customs, defendant WEXFORD deprived plaintiff of the rights, privileges and immunities secured to him by the Eighth and Fourteenth Amendments to the Constitution of the United States and laws enacted thereunder. Therefore, defendant WEXFORD is liable to plaintiff pursuant to 42 U.S.C. §1983.

**ANSWER: As the allegations in paragraph 157 are not directed to Defendants, no response is required.**

## COUNT III
### *Respondeat Superior* Claim Against WEXFORD HEALTH SOURCES, INC.

158.    Plaintiff, ERIC OLLISON, hereby incorporates and realleges paragraphs **1 -** 135, as through set forth herein in their entirety.

**ANSWER:  Defendants incorporate by reference their responses to paragraphs 1 - 135 of the factual summary as though fully set forth herein.**

159.    WEXFORD employees committed the acts set forth in detail in this complaint within the scope of their employment. An employer is liable for its employees' actions committed within the scope of their employment, because an employer should be held responsible for the torts of employees whose actions it can control and from whose actions it profits.

**ANSWER: As the allegations in paragraph 159 are not directed to Defendants, no response is required.**

160.    Defendant WEXFORD is thus liable to plaintiff, ERIC OLLISON, pursuant to the doctrine of *respondeat superior* for the actions of its employees.

**ANSWER: As the allegations in paragraph 160 are not directed to Defendants, no response is required.**

<u>**COUNT IV**</u>
<u>**Supplemental State Claim for Indemnification by State of Illinois**</u>

161.      Plaintiff, ERIC OLLISON, hereby incorporates and realleges paragraphs 1 - 135, as through set forth herein in their entirety.

**<u>ANSWER:</u> Defendants make no answer to the allegations in paragraph 161 because the Court dismissed Count IV on November 29, 2016. [Doc. 133].**

162.      The IDOC employees referred in this complaint were employed by or were agents of the State of Illinois at all times pertinent to the incidents alleged in this complaint.

**<u>ANSWER:</u> Defendants make no answer to the allegations in paragraph 162 because the Court dismissed Count IV on November 29, 2016. [Doc. 133].**

163.      Alternatively and/or in addition to the allegations that defendant medical personnel were employees and/or agents of defendant WEXFORD, those defendants were employees and/or agents of the State of Illinois.

**<u>ANSWER:</u> Defendants make no answer to the allegations in paragraph 163 because the Court dismissed Count IV on November 29, 2016. [Doc. 133].**

164.      All acts alleged herein were committed within the scope of the individual defendants' employment or agency.

**<u>ANSWER:</u> Defendants make no answer to the allegations in paragraph 164 because the Court dismissed Count IV on November 29, 2016. [Doc. 133].**

165.      The State of Illinois is empowered and directed to pay any judgment for compensatory damages (and any associated attorneys' fees and costs) for which an employee or agent acting within the scope of his/her employment or agency is found liable.

**<u>ANSWER:</u> Defendants make no answer to the allegations in paragraph 165 because the Court dismissed Count IV on November 29, 2016. [Doc. 133].**

166.    Should any employee and/or agent of the State of Illinois be found liable to plaintiff, ERIC OLLISON, pursuant to this complaint for his/her actions committed in the scope of his/her employment or agency, then the State of Illinois must indemnify such judgment for compensatory damages as well as the associated attorneys' fees and costs.

**ANSWER: Defendants make no answer to the allegations in paragraph 166 because the Court dismissed Count IV on November 29, 2016. [Doc. 133].**

## General Denial

**Defendants expressly deny any and all allegations not specifically admitted.**

## Affirmative Defenses

### A.    Exhaustion

To the extent Plaintiff has failed to adhere to the Illinois Department of Corrections grievance procedures, his claim should be barred for failure to exhaust his administrative remedies prior to the initiation of this cause of action, which serves as a bar to Plaintiff's claims by the PLRA, 42 U.S.C. § 1997e, and *Perez v. Wisconsin Dept. of Corrections*, 182 F. 3ed 532 (7th Cir. 1999).

### B.    Setoff

In the event Plaintiff is awarded damages, any recovery by Plaintiff from Defendants shall be reduced or otherwise set off by all sums paid by or for anyone who is legally responsible for the same injury, including co-Defendants Wexford Health Sources, Inc., Dr. Carla Greby, Dr. Rebecca Einwohner, Connie Sword (now Freidinger), Edna Greenhagen, Lisa Bishop, Kandis Critz (now Venyak), David Hopkins, Francie Maurice, Jennifer Easley, Karena Barker, Shirley Law, Catherine D. Reynolds, and Christine Peltier. 740 ILCS 100/2.

## Jury Demand

Defendants demand a trial by jury on all issues triable in that manner.

WHEREFORE, Defendants respectfully request that this Honorable Court enter judgment in their favor and deny all relief sought by Plaintiff.


Dated: December 10, 2021                    Respectfully submitted,

Kwame Raoul
Attorney General                            By:   s/    *Alan Remy Taborga*
State of Illinois                                  Alan Remy Taborga
*Counsel for Defendants,*                          Assistant Attorney General
GREGORY GOSSETT, ROBBIE                            Office of the Illinois Attorney General
JOHNSON, and COREY WISE                            1776 East Washington Street
                                                   Urbana, Illinois 61802
                                                   Phone: (217) 278-3332
                                                   Email: alan.taborga@ilag.gov